CHAUNCEY H. STRICKLAND, complainant,

*v.*

NATIONAL SALT COMPANY et al., defendants.

[Argued July 7th, 1911.   Decided November 20th, 1911.]

1. A certificate of indebtedness which contains in addition to a promise to pay money an agreement to keep free from encumbrance property on which the value of collateral, pledged for the security of the certificate depends, is not a negotiable instrument.

2. A corporation issued certificates of indebtedness equal in amount to expected dividends on the preferred and common stock for the time the certificates had to run, and pledged as collateral stock of another company acquired from the stockholders of that company to whom the certificates were issued; those stockholders at the same time pledged stock of the first corporation issued to them in exchange; it was agreed that the dividends received on the latter stock should be applied to the payment of the certificates.—*Held*, that in substance this was an attempt to secure the payment of dividends whether earned or not, and was an illegal transaction.

3. Where an act of a corporation violates an express prohibition of the statute, the receivers of the corporation may avail themselves of the illegality, although the corporation has received a benefit from the illegal transaction. *Camden and Atlantic Railroad Co.* v. *Mays Landing and Egg Harbor Railroad Co., 48 N. J. Law (19 Vr.) 530*, distinguished.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Stevenson, whose opinion is reported in *77 N. J. Eq. (7 Buch.) 328.*

The appellants claim the amount due on a certificate in the following form:

"$.............   JERSEY CITY, N. J.

"National Salt Company (of New Jersey) hereby·agrees to pay at the office of the American Trust Company, Cleveland, Ohio, to

or order   Dollars,

in   equal semi-annual installments, beginning

. The failure to pay any installment when due shall make all future installments become at once due and payable. Until such default shall have occurred the National Salt Company may at any time cause its liability under this instrument to be discharged by paying the amount of all future installments hereby secured to the American Trust Company, of Cleveland, Ohio, in trust to pay the same to the registered holder hereof upon demand.

"Said National Salt Company has agreed that no contract for the purchase of exhaust steam entered into by the United Salt Company prior to October 1st, 1899, and that no improvements erected or to be erected by the United Salt Company for utilizing said steam in the manufacture of salt shall be mortgaged, encumbered or in any manner disposed of until this obligation is paid or discharged, and that until such time no money borrowed or advanced by the National Salt Company for extending, improving or operating any property of the United Salt Company shall be made a charge upon or lien against the property or assets of the United Salt Company. And until such payment or discharge shall be made, said National Salt Company has further agreed that the United Salt Company shall not otherwise than by license sell or dispose of any interest in any patented process for the manufacture of salt, now owned by the United Salt Company, or for which it shall have applied for Letters Patent prior to November 15th, 1899, and that upon all licenses issued by said Salt Company there shall be paid to it a royalty of at least 25 cents per ton, settlement for which shall be made quarterly. To jointly and ratably secure the payment of this obligation and others of like tenor, and also the performance of the foregoing agreements, said National Salt Company has endorsed in blank and deposited with the American Trust Company, of Cleveland, Ohio, as Trustee, all stock of the United Salt Company acquired by it under an option given by certain stockholders of said Company, bearing date July 20th, 1899. The terms upon which said stock has been deposited are set forth in a declaration of trust executed by said National Salt Company, dated October 2d, 1899, and filed at the office of said Trust Company.

"Upon surrender and cancellation of this obligation the National Salt Company will from time to time upon demand issue new agreements of like tenor for such amounts as the holder may desire, not exceeding, however, in the aggregate the amount then remaining unpaid hereon.

"This instrument shall not be valid until countersigned and registered by the said Trust Company.

"NATIONAL SALT COMPANY,
   "By
                                      "*President.*
"Attest:
      "*Secretary.*
"Countersigned and Registered:
"The American Trust Company,
   "By                    ."

This claim was disallowed by the receiver and his determination was affirmed by the vice-chancellor. The facts as far as now material are as follows: The National Salt Company contracted for the purchase of the capital stock of the United Salt Company, an Ohio corporation. One and one-fourth shares of preferred stock and one and one-fourth shares of common stock of the National company and $106.25 in cash were to be exchanged for each share of the United stock; the cash to be paid in ten equal semi-annual installments on the first days of January and July of each year. Certificates, of which that of the appellant is one, were issued in the necessary amounts to cover the total due to each United stockholder at the rate of $106.25 per share. The amount was exactly equivalent to the dividends on the preferred stock and ten per cent. dividends on the common stock of the National company for the five years the certificates had to run. The National company deposited the United stock thus acquired with the American Trust Company of Cleveland, Ohio, to secure payment of the certificates. The declaration of trust executed by the trust company set forth that the stock was held to secure also the performance of the National company's agreement to permit no contract for the purchase of exhaust steam entered into by the United company prior to October 1st, 1899, and no improvements erected or to be erected for utilizing said steam to be in any manner mortgaged, encumbered or disposed of until the certificates were paid or discharged, until which time no moneys borrowed or advanced by the National company for extending, improving or operating the property of the United company were to be made a charge upon or lien against the property or assets of the United company. The deposited stock was

also to secure an agreement of the National company that until the certificates were paid or discharged, the United company (which was about to pass into the control of the National company) would not otherwise than by license dispose of any interest in any patented process for the manufacture of salt then owned by the United company or for which it had applied for letters patent prior to November 15th, 1899, and that upon all licenses issued under such patent there should be paid a royalty of at least twenty-five cents per ton. Upon performance by the National company of its agreement and upon payment of the certificates, the United stock was to be returned by the trust company; but in case of default in payment or the violation of any of the agreements the trust company upon the demand of any holder of the certificates was to sell the stock, or so much as was necessary, to pay the amounts due upon the certificates and to satisfy and release all liens or claims upon the contracts, improvements or patented processes, and to apply the proceeds to the payment of the balance due on the certificates and the discharge of the liens and encumbrances.

At the same time that the National company deposited with the American Trust Company its United company stock, the former stockholders of the United company deposited with the same trust company their certificates of the preferred and common stock of the National company received in exchange, which were to be held, managed and controlled by the trust company until all indebtedness of the National company upon the certificates was fully paid or discharged, but in no event later than January 1st, 1905 (that is, the date when by their terms they became due); this National company stock deposited by the former stockholders of the United company was to be held by the trust company until that time upon trust to receive all dividends and retain them until the installment next to become due upon the certificates should have become due and payable, and then to apply the same to the payment of such installment. In short, the stock of the United company and the stock of the National company to be issued in exchange therefor were both held by the trust company to secure the payment of the certificates and the performance of the contracts against encumbering the corporate

property of the United company and thereby diminishing the
security for the payment of the certificates; and the dividends
declared upon the National company's stock, instead of being
paid to the owners of that stock as dividends, were to be applied
to the payment of the amount due to them as creditors upon cer-
tificates of indebtedness; in other words, they waived their right
to receive dividends on the National stock in exchange for cer-
tificates of equal amount and agreed that their own dividends
should be applied to the payment of their own certificates of
indebtedness. In effect this transmuted their contingent right as
stockholders to dividends into an absolute right as creditors to
receive a debt.

As a result of the complicated arrangement above detailed the
National company secured possession of the corporate property
of the United company and conducted the business for a time.
Certain stockholders of the National company took proceedings
in the Ohio courts to have the arrangement declared illegal as in
violation of the Ohio Anti-trust act, and a decree to this effect
was entered in the Ohio courts. At that time there was in the
hands of the American Trust Company a balance of deposit on
account of dividends on the National stock amounting to $42,-
846.70, which was disposed of by the Ohio court, a part of it
paid to the American Trust Company for its services, and the
balance distributed between counsel in the suit.

*Mr. William J. Wallace* and *Mr. Henry W. Bean* (of New
York), and *Mr. George R. Beach* (*Mr. John L. Wilkie, Mr.
Chester A. Jayne* and *Mr. Paul Bonynge,* on the briefs), for the
appellants.

*Mr. Charles W. Fuller* and *Mr. Henry B. Twombly* (of New
York), for the receivers.

The opinion of the court was delivered by

SWAYZE, J.

It is unnecessary to consider many questions that were ably
argued at the bar as the case can be disposed of by the determi-

nation of the following: *First.* Were the certificates negotiable? *Second.* If not negotiable, were they illegal? *Third.* Is the defence of illegality open to the receivers?

*First.* It is conceded that the instrument in suit is anomalous in form. It is not exactly a promissory note nor a corporate bond, both of which are negotiable. The instrument partakes of the character both of a sealed note and of a corporate bond, but contains unusual provisions which we think deprived it of the protection with which the law surrounds negotiable instruments. By the Negotiable Instruments act of 1902, it is enacted, in section 5, that an instrument which contains an order or promise to do another act in addition to the payment of money is not negotiable, and then follow four exceptions which permit certain provisions to be inserted in the instrument without affecting its negotiability. These exceptions are—*first,* provisions authorizing the sale of collateral securities in case the instrument be not paid at maturity, or, *second,* authorizing a confession of judgment if the instrument be not paid at maturity, or, *third,* waiving the benefit of any law intended for the advantage or benefit of the obligor, or, *fourth,* giving the holder an election to require something to be done in lieu of the payment of money. Although this act was not passed until after the certificates in question were issued, it was in this respect intended as a codification of the common law. Whether this contract is governed by the law of New Jersey, where it purports to have been made, or by the law of Ohio, where it was to be performed, or by the law of New York, where it is said to have been delivered, is immaterial. The New York Negotiable Instruments act was passed in 1897 and contains the same provision. The Ohio act was passed in the same year (1902), and if the certificate is an Ohio contract the common law must prevail; there is nothing to show that the common law of Ohio differed from the law of New Jersey. In any event, therefore, the rule of law applicable is that set forth in the fifth section of the Negotiable Instruments act. None of the exceptions in that section covers the present case.

The certificates in form contain a statement of an agreement on the part of the National company that no contract for the

purchase of exhaust steam and no improvements erected or to be erected by the United company for utilizing said steam shall be mortgaged, encumbered or in any way disposed of; that no money borrowed or advanced by the National company for extending, improving or operating any property of the United company shall be a charge upon or lien against the property or assets of the United company, and that the United company shall not dispose of its patents otherwise than by licenses and for a royalty of at least twenty-five cents per ton. This is not a statement of the transaction which gives rise to the instrument, and therefore permissible under section 3 of the act, but a promise to do an act in addition to the payment of money, and therefore under section .5 makes the instrument not negotiable. While the certificates state the agreement in the past tense, there is no other written agreement to that effect and nothing more than a similar recital in the declaration of trust by the National company and the American Trust Company. We think the mere grammatical form in which the agreement is stated is not important, and that in effect the certificate contains an agreement for the protection of the assets of the United company against encumbrances and waste, for the purpose of maintaining the value of the stock of that company held as collateral for the certificates. The agreement is couched in negative terms as an agreement not to do certain things, but that is not decisive; the object of the provision of the Negotiable Instruments act was to provide against giving the extraordinary advantages of negotiability to all sorts of agreements other than for the payment of money; and although stated in the negative form the agreement is in substance a promise to do an act within the meaning of the statute in addition to the payment of money. It is in substance a promise to keep the security free from encumbrances and of the same value as when it was pledged. Our view of the scope of the language of the statute is confirmed by the language in which the first exception in section 5 is couched. This exception is of an agreement authorizing the sale of collateral securities in case the instrument be not paid at maturity. The agreement in the present case authorized a sale upon contingencies other than nonpayment at maturity. The certificates refer to the declaration

of trust for the terms upon which the stock pledged as collateral had been deposited, and the necessary effect is to import into the certificates those provisions of the declaration of trust. *McClelland* v. *Norfolk and Southern Railroad Co., 110 N. Y. 469; 18 N. E. Rep. 237.* This is so even if the only effect of the recital in the certificates is to give notice to the holder of the provisions of the declaration of trust; for if he has notice he takes the certificates subject to the terms thereof; and since the salt company and the trust company were bound by the express terms of the declaration of trust the obligor, the obligee and his transferee who of course takes with the same notice, and the trustee are all bound. One of the provisions of the declaration of trust authorizes the sale of the collateral if the salt company violates any of the agreements. A sale of the collateral for the violation of an agreement merely intended to preserve the value of the collateral is certainly not within the exception of an agreement authorizing a sale of collateral in case an instrument be not paid at maturity, since it authorizes the sale upon a condition other than that permitted by the statute. We reach this result with hesitation because the United States circuit court of appeals in the second circuit was of a different opinion. *Ingraham* v. *National Salt Co., 143 Fed. Rep. 805.* It is with reluctance that we differ from that tribunal and from the eminent judge who spoke for it. The force, however, of that opinion, is weakened by the fact that the same court at an earlier stage of the proceedings had reached an opposite result. *National Salt Co.* v. *Ingraham, 122 Fed. Rep. 40.* It was suggested in the argument that the later opinion of the circuit court of appeals had the endorsement of the supreme court of the United States which had refused to review the case by *certiorari.* We do not understand, however, that the United States supreme court, under the act of 1891, uses the writ of *certiorari* as a writ of error to review every ruling of the circuit court of appeals on questions of law. It was to avoid clogging business in the United States supreme court that the act of 1891 was passed, and the court has expressly declared that it will exercise the power to review by *certiorari* sparingly and only when the circumstances of the case satisfy it that the importance of the question involved, the necessity of

avoiding conflict between two or more courts of appeal or between courts of appeal and the courts of the state, or some matter affecting the interest of the nation in its internal or external relations, demands such exercise. *Forsyth* v. *Hammond, 166 U. S. 506.* The refusal of the court to grant the writ of *certiorari* determined only that the case was not of sufficient importance to justify its review, not that the decision of the court below was correct. We have dealt with the certificate in this respect in accordance with the common law as codified in the act of 1902, for the reason that this certificate was issued prior to that act. We are not to be understood, however, as holding that no instrument can hereafter acquire the elements of negotiability unless it answers the requirements of the statute. Mr. Machen, in his excellent work on *Corporations,* at section 1740a, calls attention to the danger of holding that the Negotiable Instruments act prevents a further development of the law merchant; but that question is not now before us.

*Second.* Since the certificate is not negotiable, it is open to the defence that it was illegal in its origin. We deem it unnecessary to pass upon the effect of the decree of the Ohio court that the contract between the National company and the United company, out of which this certificate arose, was illegal under the Ohio Anti-trust act. It is enough for us that it violates section 30 of our Corporation act, which, as it stood from 1896 to 1904, covering the period when the certificate was issued, provided that no corporation should make dividends except from the surplus or net profits arising from its business, nor divide, withdraw or in any way pay to the stockholders, or any of them, any part of its capital stock or reduce its capital stock except according to the act. We do not question the right of the National company to agree to pay in cash for the United stock a sum of money equal in amount to the dividends for a certain number of years, and if that were all that the case revealed, the most that could be said would be that the directors had made an improvident bargain, but not an illegal one. The case, however, shows a different situation, for it shows that the transaction was not in fact and in substance an exchange of one stock for another with a cash bonus. If it had been that, the stockholders of the United

company would have been entitled to receive their stock in the National company and to take from time to time the dividends thereon for their own use. Instead of doing so, they were content with a title to the National stock shorn of the right to dividends for the five years which the certificates had to run, and they put the stock out of their possession and in the hands of the trust company for the purpose of securing the payment to themselves of the amount of the certificate they themselves held. The same object would have been accomplished by providing in the certificates that any amount paid to the stockholders by way of dividends should be credited thereon, and the object of depositing the stock of the National company with the trust company must have been to give the certificates the appearance of a debt due for part of the purchase price of the United stock when in fact they were promises to pay the amount of dividends agreed upon whether earned or not. If an arrangement of this kind is legal, the thirtieth section of the Corporation act has no vital force, for to evade it, a corporation need only issue certificates of indebtedness covering the dividends which the parties may expect during the whole life of the corporation, and thus capitalize into a present debt the hopes of future earnings. We think such a transaction is in contravention of our statute.

*Third.* It is said, however, that the National company got control of the corporate property of the United company and ought not now to escape from payment of the price. This does not fully state the situation. In form, at least, the National company acquired only the stock of the United company, and even this it immediately pledged as collateral, and its own stock, which it gave in exchange, also was immediately pledged as collateral by the stockholders of the United company. The exchange of stock was, therefore, still an executory agreement, and the National company was not to receive the United stock, and the stockholders of the United company were not to receive the National stock until payment of the certificates. But, although in form, the transaction was still executory, it is fair to the appellants to concede that as a result of the transaction the National company got control of the corporate assets and property

of the United company, and although in form the only change was in ownership of the stock of the United company, in substance, there was a change of control of that company's assets. Under such circumstances, the appellants urge that the doctrine approved in this court, in *Camden and Atlantic Railroad Co.* v. *Mays Landing and Egg Harbor Railroad Co., 48 N. J. Law (19 Vr.) 530,* is applicable. We think this case is distinguishable. The doctrine of that case is applicable only to *ultra vires* contracts in the proper sense of the term—that is to say, contracts that are beyond the statutory powers of the corporation. It is not applicable to contracts expressly prohibited by statute and contrary to the public policy of the legislature. The opinion of the court clearly recognizes the distinction, for in speaking, on page 564 of the case of *Kent* v. *Quicksilver Mining Co., 78 N. Y. 159,* Mr. Justice Van Syckel says: "The propositions maintained by the court were that acts of a corporation, which are not, *per se,* illegal, or *malum prohibitum,* or contrary to public policy, but which are *ultra vires,* affecting only the interests of stockholders, may be made good by the assent of shareholders, so that strangers to them, dealing in good faith with the corporation will be protected in reliance on those acts." On page 568 he distinctly says: "Transactions which are immoral, illegal, forbidden by statute, or contrary to public policy, are not embraced in this discussion; they cannot furnish the basis for a legal cause of action." The present case comes within the class of transactions forbidden by statute, and therefore illegal and contrary to public policy, so that it is outside even of the liberal rule of the case just cited. The case of *Chapman* v. *Iron Clad Rheostat Co., 62 N. J. Law (33 Vr.) 497,* a decision of the supreme court, went upon the ground that under our act a corporation might purchase its own stock. The remark by Mr. Justice Dixon at the close of the opinion must be read in the light of what he had previously said. It is plainly no authority in case of an act forbidden by the express terms of the statute.

We think, therefore, without expressing an opinion as to the other matters dealt with in the opinion of the learned vice-chancellor, that his decree should be affirmed, with costs.

*9 Buch.* State Coun. Jr. O. U. A. M. *v.* Nat. Coun. Jr. O. U. A. M.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, VOORHEES, KALISCH, BOGERT, VREDENBURGH, CONGDON, WHITE—12.

*For reversal*—None.