**NATIONAL SURETY CORPORATION, a Corporation of the State of New York, Plaintiff,**

v.

**The MIDLAND BANK & TRUST COMPANY, a Corporation of New Jersey, Defendant.**

Civ. A. No. 80–72.

United States District Court, D. New Jersey.

Feb. 17, 1976.

Lum, Biunno & Tompkins, by Charles H. Hoens, Jr., Newark, N.J., for plaintiff.

Milton, Keane & Brady, by Thomas J. Brady, Jersey City, N.J., for defendant.

## OPINION

COOLAHAN, Senior District Judge.

This is an action[1] based upon two irrevocable documentary letters of credit by their beneficiary, a New York surety company ("the surety company"), against their issuer, a New Jersey state bank ("the bank").

### I. *The Issues Considered*

■ The principal legal question raised is whether the letters of credit are void and unenforceable more than a year after their issuance on the ground, asserted by the bank, that a New Jersey statute, N.J.S.A. 17:9A–25(3), withholds power from banks to issue a letter of credit valid for more than a year from its date of issuance.

The Court holds that the cited statute does not authorize issuance of an irrevocable letter of credit valid for more than a year from the date of its issuance, and that this matter raised in defense is sufficient to defeat the surety company's claim as beneficiary under the letters.[2]

In reaching this conclusion this Court has had to consider two issues: first, how the controverted statute should be construed, and second, whether the bank is estopped to raise a defense resting on the impropriety of its own acts in issuing the letters.

■ A third, subsidiary, issue arises from the fact that the letters of credit in this case are by their terms not valid for longer than a year but, rather, automatically renewable from year to year, as explained below. For this reason it has been necessary to decide that an irrevocable letter of credit originally issued for a period not exceeding a year, but automatically renewable from year to year (except on terms of virtually unconditional payment by the issuing bank) throughout whatever period of time the beneficiary thereof may still be required to render the performance giving rise

1. Jurisdiction in this Court exists by reason of the facts that the parties are of diverse citizenship and the amount in controversy exceeds $10,000.

2. The Court need not and does not now decide that the letters of credit could not have been the foundation of rights if drafts had been drawn under them less than a year from their respective dates of issuance. It may well be that in a suit by a beneficiary of a letter of credit the purpose of the statute is satisfied by treating a letter of credit written for longer than a year as void and unenforceable only as to drafts drawn after a year has passed.

The Court does not now decide, either, whether a bank could issue a letter of credit providing for a time draft to be accepted before the end of a year but paid after the end of the year.

Finally, it should be noted that the decision in this case in no way suggests that a beneficiary of a letter of credit could not recover against an issuing bank on equitable grounds despite the cited statute, if the bank had received funds from its customer with which to pay the beneficiary of the letter. To prevent unjust enrichment of a bank in such a case would not impair the public policy (reflected in the cited statute) of protecting bank stability, and so the beneficiary's claim in the nature of restitution might be recognized. *Intra Bank v. Wille*, No. 40361/1968 (Sup.1968) (reprinted in Record on Appeal to Court of Appeals at 486, 498–506) (discussed *infra* note 5), *aff'd mem.*, 31 A.D.2d 721, 296 N.Y.S.2d 283 (1st Dep't 1968), *aff'd mem.*, 25 N.Y.2d 619, 306 N.Y.S.2d 7, 254 N.E.2d 224 (1969), *cert. den.*, 399 U.S. 910, 90 S.Ct. 2201, 26 L.Ed.2d 562 (1970); *First National Bank of Aiken v. J. L. Mott Iron Works*, 258 U.S. 240, 241, 42 S.Ct. 286, 66 L.Ed. 593 (1922); *American Express Co. v. Citizens' State Bank*, 181 Wis. 172, 183, 194 N.W. 427, 431 (1923).

(indirectly, through documents) to its right to payment, is, at a time more than a year after the letter's issuance, subject to the strictures of the cited statute.

A final issue, meriting some discussion but not necessary to the decision in view of this Court's disposition of the above issues, is whether the letters of credit are void and unenforceable on a second ground asserted by the defendant bank, namely, that the letters, although in form letters of credit, are in substance guaranties. (It is not controverted that a New Jersey bank has no general power to make guaranties.)[3]

## II.  *The Facts of the Case*

The action was tried upon the facts before the Court without a jury. The facts stated herein, together with the appended findings, constitute the findings of fact required by Fed.R.Civ.P. 52(a). Most essential facts are not in dispute.

The defendant, Midland Bank, issued to the plaintiff, National Surety Corporation, two letters of credit in 1967, the first dated January 9 and the second dated February 1.

Each letter of credit was issued in order to induce the plaintiff to issue a bond to enable a vessel to be freed which was then detained (or about to be detained) in port under a writ of attachment in a suit in admiralty. (It is the usual practice in such an admiralty action to have a bond posted to enable the subject vessel to be released while the action continues.) Each letter of credit provided, in essence, that upon receipt by defendant of plaintiff's draft drawn thereunder, together with plaintiff's certification of its liability, loss, costs, or expense in the amount of the draft under the corresponding bond, the defendant would honor the draft. (Each letter was therefore a so-called "standby," or "guaranty" letter of credit. See part VI *infra*.)

Each admiralty suit was eventually resolved by judgment, in each case several

years after the institution of the suit, and the plaintiff paid to the obligee under each bond an amount in satisfaction of its obligation thereunder.

Plaintiff drew and presented to defendant a draft and the called-for certification under each letter of credit. One draft was presented after payment under the bond named in the corresponding letter of credit, and the other, after the defendant's renunciation of the other letter of credit, which act plaintiff reasonably treated as an election by the bank not to renew the letter. Neither draft was honored. The surety company has accordingly brought the present action to recover the sums to which it claims to be entitled under the two letters of credit.

## III.  *Construction of the Statutory One-year Limitation*

The controverted statute provides in relevant part as follows:

"[E]very bank shall, subject to the provisions of this act, have the following powers, whether or not such powers are specifically set forth in its certificate of incorporation:

.     .     .     .     .

(3) *to issue letters of credit authorizing holders thereof to draw drafts upon it or upon its correspondents at sight or on time not exceeding one year*; to guarantee, for a period not exceeding one year from the date of such guarantee, the payment by its customers of amounts due or to become due upon the purchase by such customers of real or personal property." N.J.S.A. 17:9A-25 (Banking Act of 1948, § 25, "Additional powers of banks") (emphasis added).

### A.  *Ambiguity of the Statute*

The quoted clause on letters of credit was apparently patterned after New York Banking Law § 96(2) (McKinney 1975),[4] from which it differs only in immaterial detail.

> "Every bank and every trust company shall, subject to the restrictions and limitations contained in this Chapter, have the following powers:
>
> .     .     .     .     .

---

**3.**  N.J.S.A. 17:9A–213.1;  see N.J.S.A. 17:9A–25(3).

**4.**  The relevant words of that statute are as follows:

No case brought to the attention of the Court construes the relevant portion of either the New York or New Jersey statute or any similar piece of legislation.[5] Nor has any legislative history been found.

Plaintiff, relying partly on the grammar and punctuation of the statute, claims that the words "on time not exceeding one year," like the words "at sight," define the forms of the drafts which banks are authorized to agree to honor and do not relate to the phrase "letter of credit." ("Sight drafts" and "time drafts" are, of course, commonly used phrases in the banking industry.) Plaintiff argues that the words "not exceeding one year" modify the word "time," citing the rule that a limiting clause or phrase modifies the last antecedent unless the subject matter requires a different construction.[6] *U. S. ex rel. Santarelli v. Hughes*, 116 F.2d 613 (3d Cir. 1940). The Court concludes, however, as discussed below, that the subject matter of this statute does require a different construction, and so the "last antecedent" rule is not applicable here.

█ Finally, plaintiff cites in support of its construction of the statute the prevailing rule that a draft under a letter of credit is valid if drawn "within a reasonable time" from the issuance of the letter of credit, *Lamborn v. National Park Bank, supra* note 5; 9 C.J.S. "Banks and Banking" § 176, p. 385, see *id.*, §§ 177, 173. This rule, however, is a statement of the common law, which is

2. To accept for payment at a future date, drafts drawn upon it by its customers and to issue letters of credit authorizing the holders thereof to draw drafts upon it or its correspondents at sight or on time not exceeding one year."

The subdivision of the New York statute dates from 1914, and was once cited by the New York Court of Appeals in a case cited by plaintiff, *Atterbury v. Bank of Washington Heights*, 241 N.Y. 231, 149 N.E. 841 (1925). However, the court in that case found it unnecessary to construe the statute, which it found inapplicable to the case.

5. The case of *Lamborn v. National Park Bank,* 240 N.Y. 520, 148 N.E. 664 (1925), held that a letter of credit issued without a stated expiration date was to be interpreted as allowing presentation of drafts "within a reasonable time," 148 N.E. at 666. In that case, however, the drafts were presented only about seven months after the issuance of the letter of credit, and so the possible application of the New York statute never came into question.

Our precise question has apparently not been adequately addressed by legal commentators, either, although H. Finkelstein, *Legal Aspects of Commercial Letters of Credit* 88–89 (New York: Columbia University Press, 1930), does briefly comment on a related question, saying that there are no statutory restrictions on the length of time during which a draft may be taken by a transferee in reliance on a promise to accept the draft, including, apparently, a promise in the form of a letter of credit. (The New York version of the New Jersey banking statute at issue was in effect when Finkelstein wrote, but he did not refer to it.)

One article, P. Verkuil, "Bank Solvency and Guaranty Letters of Credit," 25 Stan.L.Rev.

716, 730 n. 73 (1973), in a footnote to a discussion of a case of a foreign branch bank liquidation in New York, *Intra Bank v. Wille, supra* note 2, construes the New York cognate to the statute at issue to apply its one-year limitation to letters of credit. The author does not discuss the point, however, and an examination of the records on appeal (including the trial court's opinion) in the *Intra Bank* case shows that the trial court's opinion and the affirmance thereof neither support nor controvert such a construction of the New York statute. Whatever position the Superintendent of Banks may originally have taken in disallowing in the liquidation proceeding the claim of the CCC, which was the beneficiary under numerous three-year letters of credit issued by Intra Bank's New York branch, no objectant to the Superintendent's later compromise with the CCC raised the contention on appeal that a governing statute limited letters of credit to one year. Nor did the trial court discuss such a contention. The reason appears to be that N.Y. Bank. Law § 96(2) was not applicable to the New York branch of a foreign bank. See N.Y. Bank. Law § 200 (McKinney 1975).

6. Plaintiff also points out by way of contrast that in the clause of N.J.S.A. 17:9A–25(3) which immediately follows the clause in question the legislature placed words of time limitation in mid-clause, after the word "guarantee," when it intended the limiting phrase to modify that word rather than a word later in the sentence. However, as plaintiff itself argues, the New Jersey statutory clause in question was apparently lifted almost verbatim from the New York statute. The habitual conservatism of legal draftsmen therefore stands as another likely reason for adjacent clauses not to be worded similarly.

superseded insofar as a regulatory statute governs the same subject matter; and the Court concludes (part III–B *infra*) that the legislature did choose to regulate bank practices regarding letters of credit.

Defendant makes two main arguments on the one-year limitation issue. First, defendant argues that it would be idle for a legislature to limit the duration of time drafts drawn under letters of credit but to allow banks to have contingent obligations under letters of credit outstanding for lengthy periods of time. Defendant's conclusion is that the statute must have been intended to limit the period during which a letter of credit may be valid.

Second, defendant relies upon evidence that its interpretation of the statute is shared by the State Department of Banking, which is charged with administering the statute in the course of its regulatory supervision of state banks.

It is the Court's conclusion that the controverted statute is not clear on its face, and that it is therefore necessary to look, as defendant asks, beyond the words of the statute in order to ascertain its meaning.

## B. Considerations in Construction of the Statute

"In modern parlance, a commercial bank credit is a promise by a bank to pay or to accept the draft of a named beneficiary provided he complies with the terms and conditions set forth in the instrument conveying the promise." H. Harfield, "The National Bank Act and Foreign Trade Practices," 61 Harv.L. Rev. 782, 793 (1948). (The similar Uniform Commercial Code definition is contained in U.C.C. 5–103(1)(a), N.J.S.A. 12A:5–103(1)(a).)

The rules are well established[7] which govern the rights and duties of the parties to a typical letter of credit transaction (one involving the sale of goods)—issuer's customer, issuer, confirming bank (frequently), and beneficiary. The law has been much less settled, however, on the question of what (or which) lending and credit restrictions[8]

---

7. *See, e. g.,* Uniform Commercial Code—Letters of Credit, N.J.S.A. 12A:5–101 *et seq.,* and the comments thereto; H. Harfield, *Bank Credits and Acceptances* (New York: Ronald Press, 5th ed. 1974); B. Kozolchyk, *Commercial Letters of Credit in the Americas* (New York: Matthew Bender & Co., 1966); W. Ward and H. Harfield, *Bank Credits and Acceptances* (New York: Ronald Press, 4th ed. 1958); Farnsworth, "Documentary Drafts under the Uniform Commercial Code," 22 Bus.Law 479 (1967); Funk, "Letters of Credit: U.C.C. Article 5 and the Uniform Customs and Practice," 11 How.L.J. 88 (1965), 82 Banking L.J. 1035 (1965) and 83 *id.* 1 (1966) (an introductory article); Finkelstein, *supra* note 5; 1921 Federal Reserve Bulletin 158, 410, 681, 926.

The commercial law of letters of credit has developed through commercial and banking practice and in the courts, almost without legislative attention. U.C.C. Comment to U.C.C. 5–101, N.J.S.A. 12A:5–101. In keeping with this process of development, Article 5 of the U.C.C. is an outline of the subject rather than a code—a skeleton to be fleshed out by reference to prior and developing case law. U.C.C. 5–102(3), N.J.S.A. 12A:5–102(3); *see* New Jersey Study Comment to N.J.S.A. 12A:5–102(3).

8. There is little case law on the direct or indirect application of lending and credit restrictions to letters of credit; the statutes are skimpy; administrative interpretation, less than satisfactory; and the commentators, in disagreement. For two of the better treatments of the question, *see* Kozolchyk, *supra* note 7 at 614–635 (§ 24.03[1]) and Ward and Harfield, *supra* note 7 at chaps. 8, 9, 13.

Confusion arises partly because a letter of credit does not quite fit into the usual accounts on a bank's books. It is neither fish nor fowl—neither an acceptance nor a loan, but rather a binding promise to make an acceptance (of a time draft) or a loan (by payment of a sight draft) if its conditions are met. It establishes a contingent liability, but one which should be regarded as an actual liability for some purposes.

Most of the discussion of banks' powers regarding letters of credit has focused on the Federal Reserve Act. Under the seventh (originally fifth) paragraph of § 13 of that Act, 12 U.S.C.A. § 372, member banks are permitted to make acceptances, on certain conditions and with certain limitations, without such acceptances being subject to the restrictions of 12 U.S.C.A. § 84 (formerly R.S. § 5200). By this latter statute the obligations of any person to a member bank may not exceed 10% of the bank's capital stock and surplus. Section 372 at most only indirectly limits the aggregate dollar amount of a member bank's letters of

banks are subject to with respect to these documents.

A partial explanation for the paucity of detailed statutory regulation lies in the fact that the use of letters of credit by banks has rarely been a subject of abuse. Letters of credit are ordinarily[9] used in sales transactions, where the risk to the issuing bank is minimal: not only does the bank engage its credit for a relatively short period of time, but it also acquires a security interest in the goods. *Ward & Harfield, supra* note 7 at 59.

■ Nevertheless, considerable potential for abuse does exist. Letters of credit are usually deemed to create only contingent liabilities, and there are no fixed statutory limitations on the amount of contingent liabilities which a bank may incur. A bank which issued inadequately secured letters of credit for very large sums of money might find itself obligated to make acceptances or payments[10] under them which could dangerously exceed the lawful limits for bank acceptances or loans.

■ It is against this background of banking law and practice that the controverted statute must be viewed. In enacting a banking statute to govern letters of credit or drafts drawn thereunder, the Legislature doubtless had foremost in mind two considerations: first, the ability of state banks to fulfill legitimate commercial needs in the performance of their banking function, and second, the significant public interest in the stability of banking institutions.

■ By far the most important function of letters of credit is to finance sales of goods, a fact which should be kept in mind in considering legislation on the subject. Only rarely need a sale of goods take longer than a year to complete, and so a statutory one-year limitation on letters of credit does little to interfere with their use[11] for their traditional and principal purpose. A limit on the duration of letters of credit does, however, significantly reduce the risk to a bank that can arise from its having to honor an unsecured commitment made years earlier, when the credit standing of the bank's customer (the party to which the bank must look for reimbursement) may have been much different from what it is at the time the bank is required to pay the beneficiary under the credit.

Such changes in the financial situations of the bank's customers appear, indeed, to underlie the case at bar. This case, then, illustrates the need for a statute to limit the power of banks to issue letters of credit, as the Court finds the legislature to have intended.

■ "The stability of banks is a matter of public concern," 4 *Michie on Banks and Banking* 104, ch. 7, § 54 (perm. ed. 1971), and banking is closely regulated by statutes, which the Commissioner of Banking has broad powers to enforce, *e. g.,* N.J.S.A. 17:9A–267, 268, 269, subd. A. To regulate letters of credit by statute may be seen as in keeping with this regulatory scheme. *Cf.* 7 P.S. § 315 (Purdon's Penn. Bank. Code), Comment (no statutory limitation on the power of a

---

credit leading to § 372 ("eligible") acceptances, by subjecting the acceptances, but not the letters, to limitations. Similarly, it appears that § 84 only indirectly limits the issuance of other letters of credit, by limiting not the letters but the loans which may have to be made thereunder. (*Cf.,* however, federal regulations on "standby" letters of credit, discussed in part VI *infra.*)

The knowledge that the prevailing rules were so relatively lax as these may be a reason for the enactment of a direct limitation on letters of credit (though only on their duration) in the statutory subsection under consideration, N.J.S.A. 17:9A–25(3).

**9.** As to the use of letters of credit for purposes other than financing the sale of goods, see part VI *infra.*

**10.** Unless the bank's customer prepays for a sight draft under a letter of credit, the bank makes a loan to its customer at the moment it pays such a draft.

**11.** *Cf.* N.J.S.A. 17:9A–25.3, which directs the Commissioner of Banking in the exercise of his powers to place state banks "on a substantial competitive parity with national banks."

bank to issue letters of credit, but banking department has authority to prohibit the continuance of unsound practices).

■ That the controverted statute limits the duration of credit is the interpretation of the state Department of Banking,[12] a fact which the Court deems significant.

"The principle is well established that practical interpretation by an administrative agency is entitled to great weight in construing statutes in order to ascertain their meaning, to explain a doubtful phrase or to illuminate any obscurity." *State v. Le Vien,* 44 N.J. 323, 330 n. 5, 209 A.2d 97, 101 (1965).

## IV. *Application of the One-year Limitation to Automatically Renewable Letters of Credit*

■ One of plaintiff's contentions is that the statute under consideration, however it may be construed, makes no mention of renewals of letters of credit, and so does not apply to the ones at issue in this case, which were by their terms not valid for longer than a year but, rather, automatically renewable from year to year.

This argument fails, however, from the fact that under these letters of credit any election by the bank not to renew

gave the beneficiary a virtually unconditional right to draw against the credit before its expiration. In substance, then, each letter of credit provided that the bank could escape its obligation only by performing it. If such a disingenuous evasion of the statute were to succeed, the statute would be totally defeated: banks could undertake the very kinds of obligations which the statute is designed to prohibit. For this reason alone the letters of credit at issue in this case must be deemed violative[13] of the statute.

There is another, much more technical reason: under the terms of each letter of credit in the case at bar the bank remained irrevocably obligated throughout the month following each automatic renewal date (each December 1) and throughout the next twelve months as well, so that for one month each year the duration of the letter of credit exceeded a year.

## V. *The Estoppel Issue*

■ Plaintiff argues that even assuming the issuance of the letters of credit to have been *ultra vires,* the bank is estopped to assert such a defense. To be sure, if the bank's actions were merely *ultra vires* (beyond its powers) and nothing more, plaintiff's point would have much to recommend it. *Eastern*

---

**12.** See Appendix, Finding of Fact No. 13. Upon inquiry by the Court, the Deputy Commissioner of Banking verified that his Department has taken the position indicated by the banking examiners in the exhibits referred to. His letter reads in relevant part as follows:

"While the Department of Banking has not issued any administrative interpretations of the section in question, it has long been the Department's position that the words 'not exceeding one year' applies to the whole subsection, including letters of credit. A prudent banker would not issue a letter of credit without a maturity or termination date. It would not be sound banking to allow a contingent liability to possibly exist forever. You will note in subsection 2 of section 25 that banks have the power 'to accept for future payment at future dates drafts drawn upon it by its customers' without a maturity limitation placed upon those drafts. Why, therefore, should drafts drawn upon letters of credit have a maturity when

the letter of credit itself has no maturity? You might also refer to the Comptroller of the Currency's interpretive ruling [12 C.F.R. §] 7.7016 with respect to letters of credit. You will note the Comptroller rules that letters of credit must be written with a maturity date."

**13.** The rule might perhaps be different insofar as some types of letters of credit (presumably unsecured ones), whether calling for sight drafts or for time drafts, might be by statute or regulation fully subject from the moment of their issuance to statutory loan limitations. Such letters of credit would have to be treated on the bank's books as, in effect, loans. Letters of credit which were required (or permitted) to be treated in that way might not be subject to the one-year statutory limitation, for they would not involve the danger of over-extension of credit which the Court finds the one-year limitation to guard against. *See* the federal regulations on "standby" letters of credit, cited at part VI *infra.*

*Speedways, Inc. v. Hamilton,* 123 N.J.L. 257, 8 A.2d 297 (E. & A. 1939) (where bank had agreed with corporation to accept responsibility for carrying funds to bank, the bank was liable for money stolen from teller so carrying it, and could not rely on defense that to receive deposits other than at banking house was *ultra vires,* since such a defense would defeat the ends of justice and work a legal wrong). In the present case, however, the bank's issuances of letters of credit were contrary to a statute promoting the strong public policy of maintaining stability of banks. The bank is not estopped to assert this illegality in defense to a legal claim. 7 *Fletcher Cyclopedia of Corporations* § 3580 *et seq.* (rev. ed. 1964); *Strickland v. National Salt Co.,* 79 N.J.Eq. 182, 192, 81 A. 828 (E. & A. 1911).[14]

## VI. *The Guaranty Issue*

■ "[B]anks generally lack the statutory power to guarantee the indebtedness of other parties." Comment, "Recent Extensions in the Use of Commercial Letters of Credit," 66 Yale L.J. 902, 911 (1957); Verkuil, *supra* note 5, 25 Stan.L.Rev. at 725 (both citing authorities); 4 *Michie on Banks and Banking* 77, ch. 7, § 44 (perm. ed. 1971); *see* 12 C.F.R. § 7.7010(a) (1975). It is for this reason that the question arises whether it is not *ultra vires* or illegal for a bank to issue a letter of credit which functions like a guaranty. Comment, *supra*; Verkuil, *supra* note 5.

■ A decision on this question is not necessary to the holding of this case. However, a brief discussion of the issue and of pertinent regulations of the federal banking regulatory agencies may serve to illuminate the conclusion that the issuance of letters of credit is subject to abuses, and requires regulation.

The documentary letter of credit is in its origins and principal use a device to facilitate and finance commerce in

goods. But as the case at bar illustrates, letters of credit can be used for other purposes, too.

"The letter of credit is an almost infinitely adaptable device for insuring *the obligation to pay money.* . . .

. . . . .

It is not surprising that the convenience, reliability, and inexpensiveness of the letter of credit should encourage the expansion of its use beyond traditional boundaries. A [']guaranty['] letter of credit seeks to take advantage of these positive attributes by utilizing the letter of credit to accomplish results previously obtained by such devices as performance bonds, escrow agreements, repurchase agreements, steamship guaranties, and leases on real and personal property." Verkuil, *supra* note 5, 25 Stan.L.Rev. at 716, 721.

■ There is nothing about letters of credit as commercial instruments which restricts their use as guaranties. *See* U.C.C. 5–102, N.J.S.A. 12A:5–102, Comment 1. Indeed, it has been pointed out that "in one sense every letter of credit is a guaranty"; that "the letter of credit and the guaranty overlap one another. . . ." Harfield, *supra* note 7 at 155. The question which has been raised is, rather, one of the authority of banks to issue letters of credit not in connection with the sale of goods.

■ It now appears to be accepted that banks do have the authority to issue such untraditional letters of credit. *Barclays Bank D.C.O. v. Mercantile National Bank,* 481 F.2d 1224, 1231 n. 10, 12 U.C.C.Rep. 1173, 1186 n. 10 (5th Cir. 1973) (citing authorities), *cert. den.* 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974); *see* Harfield, *supra* note 7, chap. 10; D. Murray, "Letters of Credit in Nonsale of Goods Transactions," 30 Bus.Law. 1103 (1975); *Dulien Steel Products, Inc. v. Bankers Trust Co.,* 298 F.2d 836 (2d Cir.

---

**14.** For an old but useful discussion of the question of banks' estoppel to plead the defense of *ultra vires, see American Express Co.*

*v. Citizens National Bank, supra* note 2, 181 Wis. at 180–189, 194 N.W. at 430–433.

1962) (bank letter of credit used to pay commission upon completion of collateral transaction; no question of *ultra vires* or illegality raised); *cf.* Verkuil, *supra* note 5, 25 Stan.L.Rev. at 724–726; Comment, *supra,* 66 Yale L.J. at 911–916.

However, with the expanding use of letters of credit for nonsales transactions has come an appreciation of the peculiarly great dangers to bank solvency in the use of these "guaranty" letters of credit. Verkuil, *supra* note 5.

One response to this situation has been the promulgation of new rulings and regulations by the federal agencies charged with the regulation of banking. These official statements implicitly recognize the validity of guaranty ("standby") letters of credit, but circumscribe their use. For one, an interpretive ruling [15] of the Comptroller of the Currency defines the elements of a "true" letter of credit transaction (as distinguished from a guaranty), and thereby in effect establishes rules limiting issuance of letters of credit. As an example pertinent to this case, federal statute does not set a limit on duration of letters of credit, but the Comptroller's ruling requires that "the bank's undertaking must contain a specified expiration date or be for a definite term," 12 C.F.R. § 7.7016(b).

Most to the point, the Comptroller of the Currency subjects standby letters of credit, with narrow exceptions, to the lending limit of 12 U.S.C. § 84, by which a Federal Reserve member bank may not allow the debts, with certain enumerated exceptions, of any debtor to it to exceed 10% of the bank's unimpaired capital stock and surplus. 12 C.F.R.

§ 7.1160 (1975). *See also* 12 C.F.R. § 7.7361 (1975). Similarly, the Federal Deposit Insurance Corporation subjects standby letters of credit to "any legal limitation on loans of the bank. . ." 12 C.F.R. § 337.2 (1975).

Finally, the Comptroller of the Currency requires that the amount of outstanding standby letters of credit is to be footnoted to the balance sheet of the bank. 12 C.F.R. § 18.8(f) (1975) (see definition in § 18.2(f)).

The fact that the federal banking authorities have promulgated these rulings and regulations reinforces the Court's conclusion that the legislature of the State of New Jersey also intended by its enactment of N.J.S.A. 17:9A–25(3) to regulate letters of credit.

Counsel for the bank are to submit an order in conformance with this opinion.

## APPENDIX

### FINDINGS OF FACT

*A. As to Letter of Credit # 1549*

1. In January of 1967 suit was brought in the United States District Court for the Eastern District of Louisiana by the Baroid Division of the National Lead Company against the steamship *Kyra*, in rem.

2. In accordance with the usual procedures in admiralty a warrant was issued commanding the United States Marshal to arrest the vessel; and its owner, the Astrorico Compania Naviera, S. A., attempted to secure a bond to forestall the seizure of the vessel.

3. The plaintiff herein, National Surety Corporation, agreed to issue such

---

15. The ruling states as follows:

"*Letters of Credit Distinguished from Guaranty.*

A national bank may issue its own letters of credit to or on behalf of its customers in the normal course of its business: *Provided,* That the bank's obligation may legally be described as a letter of credit and not as a mere guaranty. In order to constitute a true letter-of-credit transaction, the following elements must all be present: (a) The bank must receive a fee or other valid business consideration for the issuance of its undertaking; (b) the bank's undertaking must contain a specified expiration date or be for a definite term; (c) the bank's undertaking must not be unlimited but be up to a stated amount; (d) the bank's obligation to pay must arise only upon the presentation of specific documents and the bank must not be called upon to determine disputed questions of fact or law; (e) the bank's customer must have an unqualified obligation to reimburse the bank on the same condition as the bank has paid." 12 C.F.R. § 7.7016 (1975).

a bond on condition that collateral security be posted in connection therewith.

4. The owner of the vessel thereupon procured from The Midland Bank, a predecessor to the present defendant, its irrevocable letter of credit # 1549 in favor of National Surety Corporation. This letter of credit was on the letterhead of the bank and was issued over the signature of the treasurer of the Midland Bank, an officer duly authorized to execute such a document.

5. The letter read as follows:

Irrevocable Letter        January 9, 1967
of Credit # 1549

National Surety Corporation
110 Williams [sic] Street
New York, New York

Attention: A. Kraus, Assistant Secretary

Gentlemen:

We hereby authorize you to draw on us at sight up to an aggregate amount of $10,250.00 available by your drafts at sight accompanied by your written certification that you have incurred liability, loss, costs or expense by reason of your having executed Bond of Indemnity or undertaking on behalf of ASTRORICO COMPANIA NAVIERA, S. A., owners of vessel SS "KYRA", in favor of Baroid Division, National Lead Company in connection with preventing attachment of said vessel by the Baroid Division, National Lead Company in an action pending in the U. S. District Court, Eastern District, Louisiana, New Orleans Division.

Such certification must enumerate the amounts payable by you for the account of ASTRORICO COMPANIA NAVIERA, S. A. All drafts so drawn must be marked drawn under credit # 1549.

It is a condition of this letter of credit that it shall be deemed automatically extended without amendment for one year from the present or any future expiration date hereof, unless thirty days prior to any such date we shall notify you by registered letter that we elect not to consider this letter of credit renewed for any such additional period. Upon receipt by you of such notice you may draw hereunder, without having incurred liability by reason of having executed your bonds or undertakings, by means of your drafts on us at sight accompanied by your written certification that the aforesaid bonds or undertakings are still outstanding and that the proceeds of your draft will be retained and used by you to meet any payments which you might thereafter be required to make under your bonds or undertakings and, further, that in the event your liability under your bonds or undertakings is satisfied, you will refund to us the amount paid, less any amounts which may have been paid by you in the meantime under your bonds or undertakings and any unpaid premiums due you on said bonds or undertakings.

We engage with you that all drafts drawn under and in compliance with the terms of this credit will be duly honored on delivery of documents as specified if presented at this office on or before December 31, 1967 or any automatically extended date, as here and before [sic] set forth.

Except so far as otherwise expressly stated, this credit is subject to the "Uniform Customs and Practice for Documentary Credits (1962 Revision), International Chamber of Commerce Brochure No. 222."

Very truly yours,
THE MIDLAND BANK
[Signature]
John Veleber
Treasurer

JJP/cf

6. Judgment was entered against the *Kyra* in the amount of $7,500 on October 15, 1971. The vessel's owner failed to satisfy the judgment and in January of 1972 the judgment was, on motion, entered against the National Surety Corporation, plaintiff herein.

7. On January 31, 1972, the National Surety Corporation satisfied that judgment, including interest and costs of suit, with its draft No. 5199351 in the amount of $7,878, payable to the Clerk of the Court.

8. On February 28, 1972, the plaintiff forwarded to the defendant its sight draft in the amount of $7,878, drawn under letter of credit # 1549, along with its certification that it had incurred expenses in that amount arising out of its execution of the bond securing the release of the S.S. *Kyra*.

9. This $7,878 draft was presented a few days less than five years and two months after the issuance of the letter of credit under which it was drawn. Under the circumstances, this presentation was made within a reasonable time from the issuance of the letter of credit. (See Finding of Fact No. 27.)

10. On March 3, 1972, the defendant rejected and returned the draft to the plaintiff along with a letter advising that the draft was being rejected "for many reasons," including the alleged facts that letter of credit # 1549 was "issued without proper authorization," that it was "an illegal and valueless document," and that the "presentation for payment . . . is not timely."

11. There was no communication between the plaintiff and the defendant

with respect to letter of credit # 1549 between the issuance of the letter of credit on January 9, 1967, and the date the plaintiff drew a draft under it, on February 28, 1972.

12. Letter of credit # 1549 appeared on the books of the bank as a contingent liability.

13. Examiners of the state Department of Banking did not take specific exception to letter of credit # 1549 in their reports dated February 16, 1968, and March 21, 1969, although the first of these did note under the heading "Statutory Violations" that two other letters of credit (not at issue here) "exceed one year limitation" of N.J.S.A. 17:9A–25(3); and the second report did note, citing the same statute, that still another two letters of credit "carry 'automatic' renewal procedures." However, the 1974 report of the banking examiners referred to letter of credit # 1549 as in violation of statute.

*B. As to Letter of Credit # 1553*

14. In January of 1967 suit was brought in the United States District Court for the District of Maryland by Ore and Ferro Corporation against the steamship *Georgia*, in rem.

15. In accordance with the usual procedures in admiralty the vessel was arrested and its owner, Asopos Shipping Co., S.A., attempted to secure a bond to effect the vessel's release.

16. The plaintiff herein, National Surety Corporation, agreed to issue such a bond on condition that collateral security be posted in connection therewith.

17. The owner of the vessel thereupon procured from The Midland Bank, a predecessor to the present defendant, its irrevocable letter of credit # 1553 dated February 1, 1967, in favor of National Surety Corporation. This letter of credit was on the letterhead of the bank and was over the signature of the president of Midland Bank, an officer duly authorized to execute such a document.

18. This letter of credit bore the number 1553, referred to the bond for the *Georgia*, and was in the amount of

$50,000. Otherwise its terms were identical to those of letter of credit # 1549.

19. In due course judgment was entered against the surety company, which satisfied the judgment with its draft No. 5325598 in the amount of $27,500.

20. Prior to judgment in the admiralty action on the *Georgia* (and prior to presentation and rejection of the plaintiff's draft drawn under letter of credit # 1549), plaintiff received a letter dated June 25, 1971, from counsel for the defendant advising that the defendant was repudiating letter of credit # 1553 as "illegal and void" and "issued without authority."

21. Treating the repudiation as an election by the bank not to renew letter of credit # 1553, plaintiff forwarded its sight draft in the amount of $50,000 to the defendant by letter dated December 13, 1971. Payment of this draft was refused orally.

22. This $50,000 draft was presented before the next expiration date under the terms of the corresponding letter of credit ( # 1553), which date was December 31, 1971.

23. The $50,000 draft was presented a few days more than four years and ten months after the issuance of the letter of credit under which it was drawn. Under the circumstances this presentation was made within a reasonable time from the issuance of the letter of credit. (See Finding of Fact No. 27.)

24. After the entry of judgment in the *Georgia* case, plaintiff's liability under its bond became fixed at $27,500. Plaintiff now demands only that sum under the second letter of credit, for by the terms thereof plaintiff would be obligated to refund to defendant the difference between the amount of its draft, if honored, and the amount plaintiff had to pay out under its bond in the *Georgia* case.

25. The second letter of credit did not appear on the books of the bank, either as a contingent liability or otherwise.

## C. As to Both Letters of Credit

26. No evidence was adduced concerning any payment to the defendant by plaintiff or by any customer of defendant in connection with either letter of credit, and so the Court finds that no such payment was made.

27. Where security is issued for the release of a ship that is a defendant in rem in a suit in the United States District Court, the liability of the ship, and therefore of the person issuing security, must await either a settlement of the case or a trial on the merits. It is not rare for settlements or trials of such cases to take place as long as five years (or sometimes even longer) after the institution of suit.

28. An employee of the plaintiff surety company, Mr. Mayell, with thirty years' experience in bond claims (Tr. p. 6), credibly testified that his company has accepted each year from "banks in New Jersey" (whether state or national banks was not specified) from "one to a half dozen" letters of credit in connection with court bonds; and that these letters of credit "remain outstanding until our obligation to pay under the bond falls due. That could be one year or five years." (Tr., p. 10) The same employee also credibly testified that he had not before encountered a question concerning the validity of a letter of credit "by any New Jersey bank." (*Id.*)

29. The experienced president of the defendant bank credibly testified, with reference to exhibits marked into evidence (copies of recent reports of banking examiners), that the practice of the State Department of Banking has been to treat as violative of N.J.S.A. 17:9A–25(3) the issuance of letters of credit with expiration dates later than a year from their respective issuance dates. (See also Finding of Fact No. 13, *supra.*)